T. B. RHODES *et al.*

*v.*

THE MISSOURI SAVINGS AND LOAN COMPANY.

*Opinion re-filed June 13, 1898.*

</div>

1. COMITY—*foreign corporation may enforce valid contracts in courts of Illinois.* Under the general rule of comity between States and the express provisions of our statutes, a foreign corporation has a standing in the courts of Illinois to enforce valid contracts made with citizens of Illinois or to enforce valid liens against property located here.

2. CONFLICT OF LAWS—*foreign corporation cannot enforce contract violating our own laws.* Comity does not require that a foreign corporation be allowed to enforce contracts in Illinois if such enforcement would be in conflict with our own laws, or work against our own citizens by giving to citizens of another State an advantage which the citizens of Illinois do not possess.

3. LOAN ASSOCIATIONS—*right of foreign loan association to enforce contracts in our courts.* In order that a foreign building and loan association may enforce in our courts a contract which would be usurious unless within the exemption given by our statute to local building and loan associations, it must appear that the statute under which such foreign association was organized is identical with or substantially like our own statute.

4. SAME—*Illinois building and loan associations cannot issue paid-up stock.* A building and loan association such as is contemplated by the Illinois statutes has no authority to issue paid-up stock or to declare and pay dividends on its stock.

5. USURY—*when corporation is not entitled to exemption from Usury law.* A corporation which, under the guise of a building and loan association, derives its loaning fund in whole or in part by issuing paid-up stock in shares of $1000 each, or any form of paid-up stock not authorized by our statute, and whose business is such as to make it a mere loaning corporation though possessing some features of a loan association, is not entitled to the protection of the statute exempting contracts of building associations from the Usury law.

*Rhodes* v. *Missouri Savings and Loan Co.* 63 Ill. App. 77, reversed.

APPEAL from the Appellate Court for the Fourth District;—heard in that court on appeal from the Circuit Court of Madison county; the Hon. B. R. BURROUGHS, Judge, presiding.

A bill in chancery was filed by appellee in the circuit court of Madison county to foreclose two mortgages given by appellants, T. B. Rhodes and Ellen Rhodes, his wife. Originally one mortgage, only, existed, which was given to secure an advance of $9000, and was executed May 3, 1893. Afterwards, on October 17, 1893, a portion of the premises described in this mortgage was released at the request of Rhodes, and an additional mortgage taken on other property to secure the same bond of $9000. Appellee is a corporation said to be organized under the laws of the State of Missouri, and having its principal office in the city of St. Louis, where this indebtedness was made payable. The appellants are citizens of the State of Illinois, and the property described in the mortgage is situated in the village of Madison, in the State of Illinois.

The bill alleges that said T. B. Rhodes was the owner of ten shares of the capital stock of the complainant, which at his request had loaned him the sum of $9000, secured by a certain lot of ground and improvements thereon; that said T. B. Rhodes, in consideration of such loan, covenanted and agreed to pay the complainant, on or before the fifteenth day of each month, the sum of sixty cents as a monthly installment on each $100 of stock above named, and also on the same day the sum of $45 as monthly in-

terest on said loan, and also the monthly sum of $45 as premium on said loan, such payments to continue until each full share of said stock should be worth on the books of the complainant the sum of $1000 according to its by-laws, and that then said sum loaned should be re-paid to complainant by the surrender to and cancellation by the complainant of nine shares of stock; that said shares of stock had been and should remain assigned to complainant as collateral security for the money loaned; that if a foreclosure and sale should be had under said mortgage, and the money realized therefrom, after paying all expenses of foreclosure and sale, be insufficient to discharge the indebtedness of said Rhodes to the complainant, then said shares of stock, or so much thereof as might be necessary, should be applied to the remaining portion of said indebtedness and revert to said company, and said Rhodes should be allowed for such stock the amount to be paid holders voluntarily withdrawing.

Both said mortgages are made exhibits and attached to the bill, and contain the usual clauses as to payment of taxes, insurance of the buildings for the benefit of the mortgagee, and provide that if default be made in the payment of the monthly installments of dues, interest, premiums or fines for the space of six months, then the whole of said indebtedness shall become due and payable and may be recovered by foreclosure. The bill alleges that said Rhodes and wife wholly failed to pay said dues, premium, interest or fines, or any of them, including the payments due by the terms of said bond since February 15, 1894, but defaulted therein for a term of twelve months, the amount of default being $2022, by means whereof the whole of said principal sum, $9000, with the assessments, interest, premium assessments and fines for said term of default, amounting altogether, less the withdrawal value of said stock, to $9836.50, had become due and payable to complainant and said mortgaged premises forfeited, etc.

By an amended answer appellants pleaded usury, and alleged the last mortgage to be void under the statute of this State entitled "An act to regulate foreign building, homestead and loan associations doing business in the State of Illinois," approved June 20, 1893, and in force July 1, 1893, and which imposed certain restrictions upon their privilege to transact business in this State.

Upon a hearing a decree was entered in accordance with the prayer of the bill, finding that there was due complainant the sum of $10,180.60, after allowing the cash or surrender value of the nine shares of stock held by defendant T. B. Rhodes and pledged by him, as security for his loan, to complainant. The decree also allowed complainant for taxes paid by it on the premises and for attorney's fees provided for in the two mortgages. Upon an appeal to the Appellate Court for the Fourth District this decree was affirmed, and from that judgment this appeal is prosecuted to this court.

T. T. HINDE, and C. N. TRAVOUS, for appellants.

KROME & TERRY, (JESSE R. LONG, of counsel,) for appellee.

Mr. JUSTICE PHILLIPS delivered the opinion of the court:

The principal error assigned by appellants, and one which embraces several other errors argued, is, that the defense of usury interposed by them should have been sustained by the circuit court. It may be conceded as a rule now fully and definitely settled in this State, that in the case of a building association organized under the act of the legislature of this State providing for the organization of homestead associations, for the purpose of loaning its funds only among its members, no interest, premium or fines accruing to it are usurious. The question has been fully settled in this State by the cases of

*Holmes* v. *Smythe,* 100 Ill. 413, *Freeman* v. *Ottawa Building Ass.* 114 id. 182, and *Winget* v. *Quincy Building Ass.* 128 id. 67.

By paragraph 78 of the act on corporations (Starr & Curtis, p. 632,) it is especially provided by the legislature that, building associations being of the nature of co-operative associations, no interest premiums, fines, etc., accruing to such corporations shall be deemed usurious. The appellee association, however, is not organized under the act of the legislature of this State above referred to, but is organized and doing business under the laws of the State of Missouri, and it is therefore urged by counsel for appellants that the section of the statute of this State above referred to, exempting building associations from usury, cannot, by any forced construction, be held to authorize foreign building and loan associations to make and enforce usurious contracts. It must be conceded, from the record presented to us in this case, that were not the same rule making exemptions from usury applied to appellee as is applied to building associations of this State, the contract between it and appellants must be deemed usurious. By sections 4 and 5 of the law relating to interest (Laws of 1891, p. 150,) no person or corporation shall, directly or indirectly, accept or receive any greater sum or value than seven per cent on any loan.

The testimony of the book-keeper for appellee, introduced on the trial of this cause, is as follows: "There is now due on the loan $10,180.60, made up of dues, premiums, interest, fines for non-payment of dues, and interest on delinquent premiums and interest, at eight per cent per annum. Loan was made May 3, 1893, and interest premiums and dues were all paid up to February 15, 1894. Total paid to that date, $1335.94, made up of premiums $424.97, interest $424.97, and dues $486. Total delinquent amount from February 15, 1894, to June 15, 1895, is $2520, made up of dues $864, interest $705, premiums $705, fines $144, interest on delinquent interest $72, taxes paid June 6, 1895, $122.50. Rhodes got loan

in different amounts, as follows:    May 17, 1893, $1608.76;
June 12, $500; July 15, $1200; July 28, $600; August 14,
$1000; August 18, $500; August 24, $500; August 31, $850;
September 11, $500; September 19, $500; October 10, $500;
October 27, $137.30; total, $8396.06.    He was charged
twelve per cent, being interest and premium from May 3,
1893.    His nine shares of stock were subscribed April 17,
1893, and dated April 15, 1893.    He is allowed to May 15,
1895, dues paid, $1350; interest on same at six per cent
for average time, $84.40; total, $1434.40.    He was charged
$2 withdrawal fee and $100 initiation fee.    The premium
on the loan was fixed by the company in advance."

June 6, 1895,—twenty-five months after the date of
the loan,—a decree was rendered against appellants for
$10,180.60.    This amount is reached, as shown by the tes-
timony of appellee, by charging appellants with $9000
loaned May 3, 1893; dues, $864; interest, $705; premiums,
$705; fines on delinquent dues, $144; taxes, $122.50; with-
drawal fee, $2; interest on delinquent interest, $72; total
$11,615.    From this amount is taken $1434.40, the total
amount allowed appellants on all accounts, including the
withdrawal value of their stock, making the amount of
the decree $10,180.60.    Thus it will be seen that appellee
recovers by the decree the difference between $11,615 and
$9000, which is $2615, for the use of the assumed full
$9000 for a term of twenty-five months. But since $122.50
of this amount was paid by appellee for appellants on
account of taxes, to be accurate we have $2615 less
$122.50, or $2492.50, decreed as compensation for the use
of $9000 for twenty-five months, which is 13.94 per cent
interest paid to appellee during the term of the loan.
Or, to state the facts in another way:    Appellants, on
May 3, 1893, borrowed $9000 from appellee, on which ap-
pellants paid, according to the testimony of appellee,
$1434.40 prior to the decree rendered twenty-five months
after the date of the loan, and yet, as shown by the de-
cree, appellants, at the date thereof, are still indebted to

appellee in the sum of $10,180.60, being $1180.60 in excess of the original loan, all of which amount, save and except the $122.50 paid for taxes, was originally contracted to be paid for the use of the $9000 loan, making the rate of interest charged 13.94 per cent.

It is, however, contended by appellee that the amount of the decree includes the sum of $144 charged and assessed as fines, and not contracted for as compensation for the use of money, but agreed to be paid merely as a penalty for default in the payment of dues, premiums, interest, etc., and hence should not be taken into account in arriving at the actual amount decreed for the use of the money borrowed by appellants. Assuming it to be true, it simply reduces the decreed compensation from 13.94 per cent to 12.53 per cent.

It is thus clearly established, that unless the former decisions of this court and the statute of this State, all of which clearly exempt a building association organized under our own statute, be applied to the appellee association its loan was usurious. The rules of comity among States, however, are so liberal, that if it should appear to us an association of a foreign State is organized and doing business under a statute similar, in all respects, to our own, we should apply to it the same rules as are applicable to associations organized under our own statute. Our legislature has recognized this rule, for paragraph 67 of the act on corporations (Starr & Curtis, p. 628,) provides: "Any corporation formed under the laws of any other State or country, and authorized by its charter to invest or loan money, may invest or loan money in this State; and any such corporation that may have invested or lent money, as aforesaid, may have the same rights and powers for the recovery thereof, subject to the same penalties for usury, as private persons, citizens of this State." Paragraph 26 of the same statute also provides: "Foreign corporations, and the officers and agents thereof, doing business in this State, shall be subjected to all the liabili-

ties, restrictions and duties that are or may be imposed upon corporations of like character organized under the general laws of this State, and shall have. no other or greater powers," etc. .

It will be seen that under these statutes, and under the general rule of comity existing between States, we will allow to foreign corporations a standing in our courts to enforce the valid contracts they may have made with our citizens, and all valid liens against property situated in this State. But that rule of comity does not require that we should allow foreign corporations to enforce contracts here if such enforcement would be in conflict with our laws, and, being thus in conflict, the enforcement whereof would work against our own citizens and give to the citizen of another State an advantage which the resident has not. (*Walters* v. *Whitlock*, 9 Fla. 86.) As has been said by this court in *Pope* v. *Hanke*, 155 Ill. 617 (on p. 628): "Comity between different States does not require a law of one State to be executed in another when it would be against the public policy of the latter State. No State is bound to recognize or enforce contracts which are injurious to the welfare of its people or which are in violation of its own laws,"—citing Story on Conflict of Laws, sec. 327; *Faulkner* v. *Hymen*, 142 Mass. 53; *Hill* v. *Spear*, 50 N. H. 253; *Fisher* v. *Lord*, 63 id. 514.

If, therefore, it appears that the State of Illinois has granted to corporations of this State certain rights and privileges, and immunity from penalties provided in certain other sections of our statute, and a foreign corporation attempts to invoke the aid of the courts of this State to the same extent, it must affirmatively appear that such foreign corporation is organized and doing business under a similar statute before it will be entitled to like consideration; and where it clearly appears, as it does in this case, that the amount received by a foreign corporation as compensation for its loan or advancement is far in excess of the legal rate of seven per cent allowed by our statute,

then it must affirmatively appear that the statute under which such corporation is organized is identical with, or at least substantially like, our own.

Before making any comparison between the appellee association and associations which are legitimately organized under the statute of this State it may be pertinent to notice very briefly the primary object and plan of associations commonly known and recognized as "building associations." They are defined in 2 Am. & Eng. Ency. of Law (604) as follows: "A building and loan association is an organization created for the purpose of accumulating a fund by the monthly subscriptions or savings of its members, to assist them in building or purchasing for themselves dwellings or real estate, by loaning to them the requisite money from the funds of the society upon good security." Endlich, in his work on Building Associations, (sec. 283,) speaking of the proper and legitimate purposes of the creation of such corporation, says: "To all practical intents it may be said to be to enable a number of associates to combine and invest their savings to mutual advantage, so that, from time to time, any individual among them may receive, out of the accumulation of the pittances which each contributes periodically, a sum, by way of loan, wherewith to buy or build a house, mortgaging it to the association as security for the money borrowed, and ultimately making it absolutely his own by paying off the encumbrance out of his subscription. It is only so far as they serve these purposes and are confined to the objects necessarily involved therein that the acts of building associations fall properly within the powers granted. As soon as they transgress these limits they are *ultra vires.*"

The statute of the State of Illinois authorizing the organization of such associations has in a great measure followed the original and first plan, which implies a cooperative association made up of many members, each of whom contributes a small amount each month.

Paragraph 73 of the act on corporations (Starr & Curtis, p. 630,) provides as follows: "The shares of stock shall be one hundred ($100) dollars each, and shall be deemed personal property, transferable upon the books of the company in such manner as may be provided by the by-laws, and subscriptions therefor shall be made payable to the corporation, and shall be payable in such periodical installments and at such time or times as shall be determined by the charter and by-laws, but no periodical payment to be made exceeding two ($2) dollars on each share," etc.

It appears from the record in this case that under sections 3 and 4 of article 5 of the act under which appellee is organized, stock known and designated as paid-up stock was issued. Such sections are as follows:

"Sec. 3. Full paid participating stock may be issued, the holder of which shall participate in all the profits of the company, and shall receive a dividend of six per cent per annum on the amount payable therefor, payable semi-annually out of the profits accrued to such stock. Such stock may be issued on the payment of the sum of $65 for each $100 certificate, exclusive of the membership fee, which fee is $1 on each $100 of stock, and the holders of such stock shall not be liable to further calls thereon. Whenever the sum credited to any one of such shares equals the face thereof, such share shall be deemed to have matured, and the holder thereof shall, on surrender of his certificate, receive the full face value thereof.

"Sec. 4. Full paid non-participating stock may be issued and sold at the face value thereof, $1000 for each full share, or $100 for one-tenth of a share. The membership fee shall be the same as in the other classes of stock. The holders of such stock shall receive a dividend of seven per cent per annum, payable semi-annually, but shall not further participate in the profits, and may withdraw the same on any interest date after one year, on thirty days' notice in writing."

A corporation which has authority to derive its revenue from subscriptions of $1000, $5000 or $10,000 by one subscriber, in whole or in part, is not a building association except in name. "It is merely a money-lending, dividend-paying corporation, to which, for some purpose, features of a building and loan association have been attached. Its purposes and powers put it outside of the pale of the beneficent statute which was intended to encourage co-operation among the saving poor, and not to aid the rich in finding good investments for their capital." *Meroney* v. *Atlanta Building and Loan Ass.* 47 Atl. Rep. 841.

The scope of the appellee association is one which is not authorized by the statute of this State. Its source for deriving its funds for loaning purposes is one which is not recognized by our statute. A true building and loan association, such as our statute provides for, has no authority to declare or pay dividends on its stock. Instead of its funds being derived from small payments made monthly by its subscribers, it may instead derive its entire fund by large subscriptions of thousands of dollars made by money lenders and capitalists, who thus, in the guise of subscribers to stock in a so-called building association, are enabled to realize thirteen or fourteen per cent interest on money invested. Such a plan of realizing funds by a building association is not recognized by the laws of this State. Neither directly nor by implication is the issuing of paid-up stock recognized by our statute. Such a procedure by the appellee is a distinct departure from the original plan of an association recognized by our statute as a co-operative building association. Such an organization, on the contrary, furnishes an opportunity to a few individuals to contribute many thousands of dollars to a fund, and loan it out at a rate of interest far in excess of the legal rate.

The cases cited by appellee in 100, 114 and 128 Ill., heretofore mentioned in this opinion, are not in point.

They involve the questions of usury as applicable to domestic associations organized under our own statute, and entirely dissimilar to the appellee association.

From this reasoning it may be concluded that an association which, under the guise of a building association, derives its fund for loaning from the issuing of what is known as paid-up stock in sums of $1000, or from any other form of paid-up stock not authorized by the statute of this State to be issued by such an association, and whose business is of such a character as to make it in fact a loaning company only, will be treated as a loaning company, and will not, in the absence of other and additional legislation, receive the benefit of the liberal statute and decisions of this State, which have attempted to foster these purely co-operative associations for building and saving purposes. It has been well said by the Supreme Court of Maryland, that "every device and shift which the wit of man could suggest has been invoked to exempt contracts for illegal interest from the operation of the law, but courts should look under the mask to discover the true nature of the real transaction." (*Andrews* v. *Poe*, 30 Md. 485.) In the last named State also a corporation which made its loans to members in the approved form of building association loans, but whose aim and nature did not bring it within the statute as a building association, was not allowed to enforce reservations lawfully permitted to such institutions. (*Williar* v. *Baltimore Building and Loan Ass.* 45 Md. 546.) The State of Pennsylvania, where such associations have existed for many years, has established the same doctrine in the cases of *Janett* v. *Cope*, 68 Pa. St. 67, *Kupfert* v. *Guttenberg*, etc. *Ass.* 30 id. 465, and *Rhoads* v. *Hoernerstown*, etc. *Ass.* 82 id. 180.

One of the cases ·which is the most thorough and the most exhaustive of the questions involved in this case, is that of *Meroney* v. *Atlanta Building and Loan Ass.* 116 N. C. 882,—an opinion by Clarke, J. There a mortgage given by

a citizen of North Carolina to an association organized under the laws of the State of Georgia was sought to be foreclosed in the former State. It was there held, in substance, that foreign building associations with powers greatly in excess of those granted by a local statute are not building and loan associations within the purview of such statute, and are not entitled to claim any special rights or powers therein granted to such associations as are organized according to its terms. Our views as heretofore expressed accord therewith. It follows, therefore, that the limit of recovery by appellee should have been the amount of money actually loaned to appellants, with legal interest thereon, which amount appellants concede. It was error in the circuit court to enter a decree for any greater sum.

Other questions are raised by the assignment of errors and argued by counsel, but it is not necessary for the purpose of this opinion to discuss them.

The judgment of affirmance of the Appellate Court and the decree of the circuit court of Madison county are reversed and the cause remanded to said circuit court.

*Reversed and remanded.*

Subsequently, upon a petition for rehearing, the following additional opinion was filed:

Per CURIAM: Since the rehearing was granted in this case we have given further consideration to the questions involved, and entertain the same views as those expressed in the foregoing opinion, and adhere to the same conclusion there announced. Said opinion is accordingly re-adopted, and it is ordered that the same be re-filed, and that the judgment heretofore entered, reversing the judgment of the Appellate Court and the decree of the circuit court, and remanding the cause to the latter court, be re-entered as the judgment of this court.