**Ira M. Cobe v. John W. Airey, et al.**

**John W. Airey, et al., v. Ira M. Cobe.**

Gen. Nos. 12,272, 12,277.

CONSOLIDATED FOR HEARING.

1. HOMESTEAD LOAN ASSOCIATION—*what not*. A company organized under the laws of a sister State will not be permitted to avail of the benefits of the homestead loan association act in this State if from its powers and methods of doing business it is not such an organization, within the meaning of the laws of this State.

2. USURY—*when defense of, established.* A homestead loan association is guilty of usury which makes a loan fixing the interest and premium to be paid thereon arbitrarily and without reference, and without attempt to conform, to the statutes regulating the making of such loans by such associations, if the interest and premium charged exceed the statutory contract rate.

Foreclosure proceeding. Appeals from the Superior Court of Cook County; the Hon. MARCUS KAVANAGH, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1905. Reversed and remanded with directions. Opinion filed March 6, 1906.

**Statement by the Court.** Ira M. Cobe filed his bill of complaint in the Superior Court against John W. and Lucinda Airey to foreclose a mortgage given by them to the North American Savings, Loan & Building Company, a Minnesota corporation, on real estate in Cook county, Illi-

nois, which had been sold and assigned by the receiver of the company to Cobe.

The bill represents that on Janury 11, 1898, Edward B. Graves was duly appointed receiver of the North American Savings, Loan & Building Company, a corporation organized under the laws of the State of Minnesota, relating to homestead and loan associations, by an order of the District Court of the Second Judicial District of Minnesota, and that he qualified as such receiver; that on January 11, 1898, said company on the relation of the Attorney General of said State of Minnesota, was duly and legally declared insolvent and was unable to carry out the purposes for which it was organized; that under the laws of Minnesota and the by-laws of the company all borrowers of its funds were required to be shareholders in an amount equal to the sum loaned, and payments for the shares were to be made in installments of sixty cents per month on each share held by the borrower, and by the maturity of additional shares equal at par value to the premium bid by the borrowing member for the privilege of loan, etc., and by the payment of monthly installments of interest on the principal sum at the rate of seven per cent. per annum.

That on February 4, 1891, John W. Airey being the owner of 24 shares in said company, and being then indebted to it in the sum of $1,200 for money then advanced to him, made and delivered to it his note of that date, whereby he promised to pay to the company at its office in St Paul, Minnesota, $1,200 after three years and before nine years from date or at the time when 24 shares of stock should become of the par value of $100 with interest at six per cent. per annum in equal monthly installments, and also agreed to pay the sum of $20.40 each month, of which amount $7.20 was to be applied on 12 additional shares as premium stock and the sum of $6 as interest on said $1,200, said payments of dues and interest to be continued until the series to which said shares of stock belonged should become of the par value of $100; that to secure said loan, etc., he assigned to said company said shares of stock; that under the plan of business of

said company Airey bid for the purpose of obtaining priority
a premium equal to 50 per cent. of the value of said 24
shares, and to further secure the payment of said principal
sum, interest, premium and dues he mortgaged to said com-
pany the premises described therein.

On December 22, 1903, by order of said District Court
said receiver was directed to sell the assets of said company,
and on January 17, 1904, said receiver assigned said securi-
ties to complainant.

There was due at the time of the appointment of said re-
ceiver, from Airey to the company, $849.56, and that there
was due at the filing of the bill said sum with interest there-
on at 7 per cent. per annum and $100 attorneys' fees, mak-
ing a total of $1,306.69; that default existed and foreclos-
ure was prayed.

The company's articles of incorporation, the note and mort-
gage, were attached to the bill as exhibits and were after-
wards offered in evidence.

Airey and his wife filed their joint and several answer in
which they set up the defense of usury and set up sections
of the statutes of Minnesota under which the company was
organized, as follows:

"Sec. 1. Whenever any number of persons not less than
ten desiring to be incorporated as a building and loan asso-
ciation for the purpose of accumulating the savings and
funds of its members and loaning them only the funds so
accumulated, they shall make and execute a written declara-
tion to that effect, etc.

"Sec. 3. Each association shall adopt by-laws for its gov-
ernment and therein prescribe the manner in which its busi-
ness shall be transacted, which by-laws shall be in conformity
with the provisions of this act    *    *    *.

"Sec. 4. For every loan made a non-negotiable bond or note
on real estate shall be given, which security shall be in double
the value of the loan and satisfactory to the directors and
shall be accompanied by transfer and pledge of the shares of
the borrower to the association.    The shares so pledged shall
be held by the corporation as collateral security    *    *    *.

"Sec. 15. All building and loan associations hereafter in-

corporated in this State shall have an authorized capital of two million dollars   *   *.   *.

"Sec. 18. On or before the first day of September in each year every building and loan association   *'   *   *   shall deposit with the Public Examiner a report of its affairs and operations for the year ending on the 30th day of June, immediately preceding: Such reports to be verified   *   *   * and containing the following   *.   *   *:

"A detailed statement of assets and liabilities   *   *   *.

"Sec. 22. The name 'Building and Loan' association *   *   *   shall include corporations   *   *   *   doing a savings and loan or investment business, on the building society plan, whether mutual or otherwise, and whether issuing certificates of stock, which mature at a time fixed in advance ·or not.

"Sec. 25. Any premiums taken for loans   *   *   * shall not be considered or treated as interest, nor render such association amenable to the laws relating to usury.

"Sec. 26. Every such association   *   *   *   are hereby prohibited from hereafter creating or issuing preferred or non-contributing stock   *   *   *.

"Sec. 30. Every such association shall provide in its by-laws in what manner applications and bids shall be received and who shall be entitled to loans thereunder; such bids shall be open at said times, and all the money in the loan fund shall be loaned upon such bids provided that the securities shall be in the amount and of the character stated in this act, and the amount bid shall not be less than the rate for any legal indebtedness under the laws of this State; the object of this section being to prevent such association from retaining in its loan fund any moneys actually bid for, for the purpose of securing better bids, or inducing bidders to raise their bids and to compel said associations to loan their funds to the highest and best bidders therefor.

"Sec. 31. That no association   *   *   *   shall set apart as an expense fund, exclusive of admission fees, to exceed $1.00 per year upon each share of its stock or assess any fines   *.   *   *   in excess of 10c per share for the first month that the same shall be in arrears, and 15c per share per month for every month thereafter."

The answer also set out the by-laws of the company which were in force at the time of the transaction in question, which were as follows:

"Section 1. Any person may become a member   *   *   * by signing an application   *   *   *   and paying the admission fee.   Such application, however, must be approved by the president or managing director before the certificate shall be issued thereon.

"Sec. 2. Every person becoming a member   *   *   * shall pay an admission fee as follows:   *   *   *   On one share of stock $3, on 2 shares $5, on 3 shares $6, etc., on 10 shares $10; each additional share $1.00.

"Article 2, Section 1. Shares   *   *   *   shall be payable in monthly installments of 60c per share   *   *   *.

"Sec. 3. When any share has matured by payments and profits credited to the full amount of $100 the same may be withdrawn   *   *   *.

"Sec. 2. On all advance payments for not less than six months the members shall be entitled to receive interest at the rate of 7 per cent. per annum.

"Sec. 8. This company may issue special certificates for stock fully paid up.   Paid up stock shall be sold at $50 per share in advance   *   *   *.   To members investing in this way a dividend of 6 per cent. per annum, payable semi-annually, shall be paid on the price of stock.   The dividend will therefore be $15 every six months on 10 shares costing $500.

"The amount of the dividend shall be deducted from the profits earned, the balance being credited to the stock.   When the amount standing to the credit of the stock equals $100 the stock shall be deemed to have matured and the holder may   *   *   *   receive $100 per share therefor.   Members withdrawing this stock may receive the full amount paid therefor at any time after two years, together with ¾ of the accrued earnings of said stock, less the 6 per cent. interest paid on such shares.

"Article 3, Section 1. The funds of this company can be loaned only to members on real estate security or on shares   *   *   *.

"Sec. 5. Members applying for loans, who have not paid

installments to the amount of $10, must advance that amount to secure the expenses of appraisal and examination of title * * *.

"No loan shall be made until the abstract of title * * * has been examined and favorably reported upon by the attorney.

"Sec. 10. All applications * * * shall be made in writing on blanks to be furnished by the company * * *.

"Sec. 11. All members filing applications shall have the privilege of bidding for loans. Bids shall be opened on the second Tuesday of each month and on such other days as the directors may appoint.

"Whenever the board is prepared to make a loan a notice stating the time when bids shall be open shall be sent by mail to every applicant at least 15 days before the day for opening the bids.

"Sec. 12. No loan shall be granted to any members unless three months' installments on stock shall have been paid unless the directors shall decide to the contrary.

"Sec. 16. No application for loan will be entertained in which the bonus bid is less than the amount fixed by resolution by the board of directors for the year in which the loan is made.

"Article 5, Section 1. If any monthly installment is not paid when due. * * * such shares shall be forfeited but they will be reinstated at any time within 12 months by the payment of all arrears and by the payment of a fine of 10c per share for the first month and a fine each subsequent month of 15c per month upon each share.

## LOCAL BOARDS.

"Article 7, Section 1. In localities where not less than 100 shares have been subscribed and first payment made, a local board, consisting of not less than five members, each holding not less than 10 shares, may be nominated by the agent of the company and appointed by the board of directors. The duties of members of local boards shall be to promote the increase of membership, the prompt payment of installments and advising the board of directors in relation to loans in their localities."

Cobe v. Airey.

It is denied that there is due to complainant the sum of
$1,306.39 or any sum of money whatever.    It is also denied
that Airey bid and promised to pay the company in consider-
ation of obtaining said loan a premium equal to 50 per cent.
of the par value of said stock.

The answer avers that the note and mortgage were executed
in Illinois, and that at the time defendants were residents
and citizens of Illinois; that notwithstanding the provisions
of the note and mortgage that the same are to be governed
by the laws of Minnesota, they are as to their execution, con-
struction and enforcement governed by the laws of Illinois;
that at the time of making the loan the company had a gen-
eral agency in Illinois, was doing business in this State and
that its agents in control of said agency had authority to and
did pass upon the application for the loan and that all trans-
actions in relation thereto were conducted with such agency
in Illinois and the securities were delivered to and the money
was paid through said agency in Illinois and was received by
defendants in this State to be used here and that it was fur-
ther agreed that the loan would be repaid here by monthly in-
stallments at the Illinois agency and was so paid for a long
period of time after the consummation of the transaction;
that the said provisions were not inserted in the securities in
good faith, but as a fraudulent device to enable the company
to evade the usury laws of Illinois.

By an amendment to the answer it is claimed that said
company was not a building and loan association within the
meaning of the laws of Illinois, and that the statute of Min-
nesota is not sufficiently similar to the statute of Illinois
governing building and loan associations to entitle the com-
pany to invoke the rule of comity or justify the courts of this
State in applying to it the same rules and according it the
same privileges as are applicable to Illinois associations.

It is further asserted that said company was in its char-
acter by virtue of its charter and by-laws a fraudulent device
to enable it to secure extortionate and usurious compensation
for the use of its money; that said company issued and sold,
in accordance with its by-laws, upon the payment of $50 per

share, certificates of stock fully paid up, and agreed to and did pay thereon semi-annual dividends of seven per.cent. per annum which were deducted from the profits earned on such paid up stock, the balance being credited to the stock which was matured when the amount standing to its credit should equal $100, and was subject to withdrawal at any time after two years, the member holding such stock in case of withdrawal to receive the full amount paid therefor, together with three-fourths of the accrued earnings of said stock less said dividends; that the company prior to and at the time of the transaction in question had established agencies in various States other than Minnesota, and loaned its money on real estate situated in other States beyond the inspection and control of its officers and it transacted the business through the medium of local boards of non-residents of Minnesota; that its money was not offered for loan in open meeting of its board of directors to the stockholder who might bid the highest premium for the priority of loan as contemplated by the statute of Illinois, and that the company was in other particulars essentially different in character from an Illinois building and loan association; that in making the loan in question it did not offer its money at a regular stated open meeting of its board of directors to the stockholders who bid the highest premium for the preference, but that the whole transaction was a matter of private negotiations between defendants and the agents of said company in this State contrary to the provisions of the Illinois statute.

Complainant's replication to the original answer was ordered to stand to the answer as amended.

The cause was referred to a master in chancery to take proofs and report the evidence with his conclusions on the law and the evidence.

The master's report finds that the company was dissolved and the complainant purchased the assets of the company at the receiver's sale and among them the note and the mortgage in question; that on January 15, 1891, the defendant Airey made and delivered to one of the local agents of the company at Morgan Park, Cook county, Illinois, his bid for

a loan of $1,200, in which he agreed to hold 24 shares of stock in the company and to continue payments of installments on the stock until it matured or until the loan was paid otherwise, and he agreed to pay the company 50 per cent. of the stock as a bonus for the loan; that the stock was assigned to the company and the note and mortgage given as security for the loan; that in his opinion the question presented was not one of usury but one of power on the part of the company to exact from Airey the stipulation contained in the bid for the loan, and that the company had exceeded its power, and that the complainant was only entitled to recover the amount actually loaned with interest at six per cent. per annum, less the amounts paid to the company by Airey, and states the account as follows:

"Amount of loan.........................$ 1,200.00
Deduct membership fee....................    24.00

      Balance ........................  1,176.00
Interest on $1,176 from Feb. 4, 1891, to June 14,
   A. D. 1896, at 6 per cent., computed on the
   basis of monthly rests and application of
   payments ...........................    210.23

      Total .......................  1,386.23

PAYMENTS.

64 1-3, $14.40, stock..............$926.40
64, $6.00 .......................   384.00   1,310.40

      Balance due June 4, 1896.......    75.83
Interest at 6 per cent. from June 4, 1896, to
   Dec. 14, 1904.......................    39.05

                      114.88
Solicitor's fees .........................   100.00

   Due complainant Dec. 14, 1904........   214.88"

Objections and exceptions to the master's report were filed by complainant and defendants.

The court by its decree sustained the master's report except in certain particulars not necessary to state here, and entered a decree of foreclosure for the amount found by the master.

Both the complainant and the defendants prosecute separate appeals which are here consolidated for hearing.

S. W. SWABEY, for Ira M. Cobe, appellant and appellee.

FREDERICK MAINS, for John W. Airey, et al., appellants and appellees.

MR. PRESIDING JUSTICE SMITH delivered the opinion of the court.

The defense of usury interposed by the defendants to the bill rests upon the question whether or not the North American Savings, Loan & Building 'Company was a building and loan association within the intent and purpose of the laws of Illinois governing homestead loan associations under the evidence in the record; and if it was a building and loan association within the meaning and intent of the laws of Illinois at the time of the transaction in question, did it conform to the requirements of such laws in making the loan to defendant Airey?

On the hearing before the master in chancery the copies of the Minnesota statute under which the company was organized, and the by-laws of the company as set out in the answer of the defendants, were stipulated to be correct copies respectively of the statute and the by-laws, and were introduced in evidence.

The copy of the articles of incorporation of the company attached to the bill of complaint was also put in evidence. By article third of the articles of incorporation it is provided among other things: "This corporation may also borrow money upon the sale of debentures issued by said corporation." Article fourth fixes the limit of indebtedness which

the corporation may incur at $1,000,000, and provides that the amount of its indebtedness, exclusive of debentures issued by it, shall not exceed $10,000.

Section 8 of the by-laws of the company provided for the issue of fully paid up stock for $50 per share, and for dividends upon such stock at six per cent. per annum, payable semi-annually, on the price of the stock; and that the amount of the dividend should be deducted from the profits earned, the balance to be credited to the stock. When the amount standing to the credit of the stock equaled $100 the stock should be deemed to have matured, and the holder might withdraw the same, receiving the amount paid therefor at any time after two years, together with three-fourths of the accrued earnings of said stock, less six per cent. interest paid on such shares.

The evidence shows that under this section the company was engaged in selling fully paid up stock before and at the time of the loan to defendant Airey, and that on March 31, 1891, it had sold of this stock $33,866, and that of this amount $410 had been withdrawn.

It further appears from the evidence that the company did not offer its money for loan in open meetings of its board of directors, but at closed meetings at which written applications, such as Airey made for this loan, were received from borrowers who were ignorant of the amount in the treasury and of the number or terms of applications made by others. The terms of the loans were fixed arbitrarily as to the premiums, which were made at one hundred per cent. of the amount loaned, payable in fifty per cent. of the borrower's stock, which in each instance was double the amount of the loan. The company had local boards organized in localities in this and other states which were to pass upon the loans, but in the Airey loan this formality was not observed. There were other characteristic peculiarities of the business conducted by the company bearing upon the question before us, which might be mentioned, but we do not deem it necessary, in the view we take of the case, to call attention to them.

In our opinion the features of the organization above mentioned and its methods of business as shown by the evidence place the company entirely outside of the scope and purpose of the statutes of Illinois relating to homestead loan associations. It is not a building and loan association as known to our statute. Rhodes et al. v. Missouri Savings Co., 173 Ill., 621. We do not deem the question raised in argument that the company does not fall within the building and loan statute of Minnesota as pertinent here, and we express no opinion upon it. For the purposes of this case we need go no further than to test the company by the statutes of this State, for if it does not conform in purpose and business methods to our laws, it can have no standing here as a building and loan association, under the rule of comity between states.

In Stevens v. Pratt, 101 Ill., 206, the court referring to section 26, chapter 32, R. S., said: "Where the general laws of this State provide for the organization of corporations, foreign corporations of like character doing business in this State, shall exercise no greater or different powers, and shall be subject to the same liabilities, restrictions and duties. The manifest and only purpose was to produce uniformity in the powers, liabilities, duties and restrictions of foreign and domestic corporations of like character, and bring them all under the influence of the same law."

In the Granite State Provident Association v. Lloyd, 145 Ill., 620, the court after quoting the above language says: "We think this language clearly shows that under said section 26, when a foreign corporation of any kind comes into this State to transact business, it must conform to the laws of this State, if such exist, regulating similar corporations organized under the general laws of this State; also that no law of comity between this and other States is thereby violated; it being simply a law of regulation, and in no sense one of prohibition." See also The St. Louis Loan & Inv. Co. v. Yantis, 173 Ill., 321.

In the transaction before us there was no pretense of conforming to the regulations of the Illinois statutes. The man-

ner in which the business between the company and Airey was conducted shows conclusively that neither party to the transaction contemplated a competitive bid for the priority of loan. Airey agreed with Lakore upon the terms of the loan and on January 15, 1891, paid the admission fee of $24 which he thought was a commission to Lakore, the sub-agent of the company at Morgan Park, Illinois, for his services in negotiating the loan. The loan was referred to the general agent of the company, Starbird, who directed Lakore to close it up without waiting for the organization of the local board at Morgan Park. Starbird himself approved the security and directed Lakore to procure the abstract of title. Airey delivered his abstract to Lakore or the attorney for the company and executed the note and mortgage, and on the approval of the title by the attorney the securities were delivered and the money advanced. This was all done in Chicago. Airey attended no meeting of the board of directors and made no bid for the loan in the sense contemplated by the statute. He signed the so-called bid and subscribed for the 24 shares of stock and assigned them to the company, agreeing to continue payments of installments thereon until the stock matured or the loan was otherwise paid. He also agreed to pay the company a bonus of 50 per cent. of the stock as a premium for the loan. These conditions, together with six per cent. per annum interest on the loan for the whole time, were thus imposed upon the defendants unlawfully and arbitrarily, by private negotiations and contract without reference to any competitive bid for the priority of loan in open meeting of the board of directors, and made the transaction usurious under the laws of this State.

In Borrowers' Building Ass'n v. Eklund, 190 Ill., 257, the court in declaring the effect of section 11 of the Homestead Loan Association Act, said: "The statute does not by any means invest these associations with unrestricted authority to enter into private contracts with individual stockholders for interest or premiums without regard to the general laws limiting the rate of interest which may be lawfully contracted for. On the contrary there are but two modes by which such asso-

ciations may make loans of this privileged character. These modes of procedure are set forth in section 8 of the statute under which such associations have existence." The court, after quoting section 8, says: " These modes of making loans and contracting for interest by way of premiums were not declared by the legislature for the mere purpose of directing an orderly manner of business procedure for the associations, but for the purpose of operating as a restraint upon the power of such associations to enter into oppressive contracts for interest or gains for the use of their money."

The court holds that the transactions under review in that case were usurious, and that the association had forfeited the right to collect any interest whatever; but that only the sums loaned should be required to be repaid by the appellee because of the failure of the association to observe the provisions of the statute. To the same effect is Jamieson v. Jurgens, 195 Ill., 86.

The evidence clearly shows that defendant Airey had paid back to the company $1,310.40, and therefore had paid to the company more than the amount loaned to him. Nothing was due on the mortgage at the time the bill was filed. Complainant Cobe received the securities subject to all equities between Airey and the company and is not entitled to the relief prayed. The decree is therefore reversed and the cause is remanded with directions to dismiss the bill for want of equity.

*Reversed and remanded with directions.*